Case No.22-2566

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

_____

TAMICA SMITHSON,

      *Appellant*

v.


LLOYD AUSTIN, Secretary
of Defense, Department of Defense[1],

     *Appellee.*

_____

Appeal from the United States District Court
for the Southern District of Indiana
Case No. 1:20-cv-03021-JRS-MJD
The Honorable James R. Sweeney, II

_____

APPELLANT'S BRIEF

_____

Robin C. Clay
*Counsel of Record*
Curlin & Clay Law, Association of Attorneys
8510 Evergreen Avenue, Suite 200
Indianapolis, IN 46240
(317) 202-0301
rclay@curlinclaylaw.com

---

[1] The original Complaint [Dkt. 1] originally identified Chris C. Miller, Acting United States Secretary of Defense, Dept. of Defense, as the Defendant. On January 22, 2021, Lloyd Austin was sworn in as the new Secretary of Defense, so subsequent filings substituted Lloyd Austin as the agency official. The District Court opinion identified the parties of the original complaint.

## CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No.:         22-2566

Short Caption: *Smithson v. Austin, Secty. Of Defense, Dept. of Defense*

    (1) The full name of the party(s) that the attorney represents in this case:

       Tamica Smithson

    (2) The name of all law firms who partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

       Curlin & Clay Law, Association of Attorneys

    (3) If the party or amicus is a corporation: N/A

    (4) Attorney's Signature: *s/Robin C. Clay*          Date: December 1, 2022

       Attorney's Printed Name:  Robin C. Clay

    (5) Counsel of Record for the above listed party: Yes

    (6) Address:          Curlin & Clay Law, Association of Attorneys
                8510 Evergreen Ave. Suite 200
                Indianapolis, IN 46240

Phone Number: (317) 202-0301          Fax Number: (317) 282-0688

Email Address: rclay@curlinclaylaw.com

## <u>STATEMENT REQUESTING ORAL ARGUMENT</u>

Pursuant to Seventh Circuit Rule 34(f), Appellant respectfully requests oral argument. This case presents an important question regarding reasonable accommodations in the workforce and whether marginal functions can be designated as essential functions based on the employer's judgment alone. Appellant believes oral argument will be of significant benefit to the Court.

# <u>TABLE OF CONTENTS</u>

Disclosure Statement…………………………………………………………..1

Statement Request Oral Argument…………………………………….…………2

Table of Contents…………………………………………………………………3

Table of Authorities………………………………………………………………4

Jurisdictional Statement…………………………………………………………...5

Statement of Issues…………………………………………………………………6

Statement of the Case………………………………………………………………6

    A.  Tamica Smithson………………………………………………………6

    B.  Smithson's Job Performance……………………………………………6

    C.  Smithson's Disabilities…………………………………………………7

    D.  Smithson's Reasonable Accommodations………………………………7

    E.  DODEA's November 6, 2017 Leave Policy………………………………9

Summary of the Argument…………………………………………………………11

Argument…………………………………………………………………………...11

       Standard of Review………………………………………………....12

    I.      THE DISTRICT ERRED NY RUBBER STAMPING THE EMPLOYER'S ALLEGED ESSENTIAL FUNCTIONS…………………………12

    II.     DISTRICT COURT ERRED IN FINDING SMITHSON UNQUALIFIED AND IGNORING HER DISABILITY CLAIM…………………………..18

Conclusion……………………………………………………………………..19

Certification of Compliance…………………………………………………..20, 21

Appendix: Order Granting Summary Judgment to Defendant,
      dated August 4, 2022…………………………………………………22

## TABLE OF AUTHORITIES

Cases                                                                        Page

*Abdullahi v. City of Madison,* 423 F.3d 763, 769 (7th Cir. 2005)          12

*Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 248 (1986)                   12

*Basith v. Cook County*, 241 F.3d 919, 924 (7th Cir. 2001)                 15

*Branham v. Snow*, 392 F. 3rd 896, 902 (7th Cir. 2014)                   12

*Bush v. Am. Honda Motor Co Inc.,* 227 F. Supp 2d 780, 790 (S.D. 2002)       18

*DePaoli v. Abbot Labs*, 140 F.3d 668, 672 (7th Cir. 1998)                 12

*Dilettoso v. Potter* No. CV 04-0566-PHX-NVW, 2006 U.S. Dist. LEXIS 2973     18
*8 (D. Ariz. January 25, 2006)

*EEOC v. Sears Roebuck & Co*., 417 F.3d 789, 797 (7th Cir. 2005)           13

*Lawson v. CSX Transp. Inc.,* 245 F3d 916, 922 (7th Cir. 2001)            18

*Nicholas v. Acuity Lighting Group*, 2005 U.S. DIST. LEXIS 1645 *26-27       14
(S.D. Ind. January 4, 2005)

*Paz v. Wauconda Healthcare & Rehab Ctr., LLC,* 464 F.3d 659, 664           12
(7th Cir. 2006)

*Rel v. Electronic Data Systems Corp*., 99 F.3d 678, 683 (5th Cir. 1996)  14

*Timmons v. GMC*, 469 F3d 1122, 1126 (7th Cir. 2006)                      18

*Traylor v. Brown*, 295 F3d 783, 788 (7th Cir 2002)                       18

*U.S. Airways, Inc. v. Barnett*, 535 U.S. 391 (2002)                        16

*Waldridge v. Am. Hoechst Corp*., 24 F.3d 918, 920 (7th Cir. 1994)        12

*Williams v. Lovchik*, 830 F. supp 2d 604, (S. D. Ind. 2011)               18

Statutes

28 U.S.C. §§1331, 1343                                                        5

29 U.S.C. § 701 et seq                                                       5

42 U.S.C. §12102(2)(A)                                                       13

42 U.S.C. §12102(4)(A)                                                       12

42 U.S. C. §2000e et seq                                                     5

## JURISDICTIONAL STATEMENT

The action from which this appeal is taken was filed on November 17, 2020, in the United States District Court for the Southern District of Indiana. [Dkt. 1].[2] Plaintiff complained of race discrimination, a hostile work environment, and retaliation, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S. C. §2000e et seq., ("Title VII"), as well as disability discrimination, including a failure to accommodate, and retaliation, in violation of Section 501 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 701 et seq. ("Section 501"). Jurisdiction was conferred on the District Court under 28 U.S.C. §§1331, 1343.

This is an appeal from a final judgment entered on August 4, 2022, by the Honorable District Court Judge James R. Sweeney, II.  [Dkt. 49]. Plaintiff timely filed her Notice of Appeal on September 2, 2022.  This Court has jurisdiction of this appeal under 28 U.S.C. §§1291 and 1294, as an appeal of a final decision from the District Court.

---

[2] Cites to the Record have the following key: Dkt- Docket Number; Ex- Exhibit; p- Page; ¶- paragraph

## STATEMENT OF THE ISSUES

1. Did the District Court err by deferring entirely to the employer for its judgment on essential functions.

2. Did the District Court err in determining plaintiff was not a qualified individual with a disability?

## STATEMENT OF THE CASE

### A. Tamica Smithson

Tamica Smithson ("Smithson"), has worked with the Department of Defense Education Activity Office ("DODEA") as a teacher since 2004. (Dkt. 1 at ¶7, Dkt. 35-1 at 26:12-15). Smithson is licensed to teach biology, chemistry, and general science. (Dkt. 35-1 at 23:9-14). In 2006, Smithson transferred to Vilseck Germany to teach at Vilseck High School ("Vilseck"). (Dkt. 35-1 at 28:6-12).

### B. Smithson's Job Performance

From August 2016 through June 2021, Marc Villareal ("Villareal") was the Principal of Vilseck and was Smithson's direct supervisor (Dkt. 35-2 at 1, ¶3; Dkt. 44-6 at 3:8-12, at 4:5-8). Villareal never indicated any performance deficiencies in Smithson's evaluations. (Dkt. 44-1 at 16:2-5). In Villareal's opinion, Smithson was qualified to teach biology, chemistry, general science, "and maybe more." (Dkt. 44-1 at 17:6-9). Smithson had a good work record and had never been disciplined for anything. (Dkt. 44-1 at 54:15-23). Smithson was fully successful in her performance. (Dkt. 44-1 at 54:23-25; 55:1-2)

C. <u>Smithson's Disability[3]</u>

Smithson suffers from numerous disabilities, including migraines, intracranial hypertension, affective disorder, vertigo and ADHD. (Dkt. 44-5 at 5-6). The intracranial hypertension is a lifelong condition (Dkt. 44-5 at 6). Smithson's disabilities affect her major life activities in that they make her unbalanced, have difficulties walking, difficulties driving, breathing problems, and experienced impaired vision, speech, and memory. (Dkt. 44-5 at 6; Dkt. 35-1 at 286:1-7).

D. <u>Smithson's Reasonable Accommodations</u>

Since 2010, Smithson has had a record of suffering from migraines and dizziness. (Dkt. 35-11 at 15). In September 2010, Smithson made a request for accommodation wherein she requested a flexible duty reporting time, and the ability to sit during class time due to her migraines, vertigo, dizziness, and being off-balance. (Id.)  Smithson indicated that she would need the accommodations, "some mornings," and that any time she used in the morning, she would make it up at the end of the day. (Id.)  As an example, she indicated that if she needed 15 minutes in the morning, then she would stay an extra 15 minutes in the evening. (Id.)("For example, if I report to work at 0805, then I would not leave until 1535. This amounts to a 15 min. flex for the day.")

In 2014, Smithson requested additional accommodations, including that she be provided immediate relief during anxiety attacks, specific solutions to decrease anxiety, be excused from frustrating situations such as irate parents, continued use or memory aids, and extra time for tasks such as grading or training. (Dkt. 35-11 at 18).  Smithson noted that having first period as

her prep period, where she did not have to provide instruction, had been a "big help" over the last two years. (Id).

In August 2015, Smithson made another accommodation request for an alternate work area (outside of the building), a continuation of her flexible reporting time due to the severity of her migraines, dizziness, nausea, and the agitations of her medication; classroom facilitation (to be seated most of the time due to migraines, vertigo and imbalance); immediate relief during anxiety attacks; immediate communication of performance concerns so as to alleviate Smithson's anxiety; excused from frustrating situations (such as irate parents); extra time for completing tasks such as grading policy, paperwork, and training, and "Note: 1st period planning has been a huge help over the last couple of years, allowing time for medical effects to subside." (Dkt. 35-11 at 9)

On or about October 23, 2015, Smithson's supervisor approved the following accommodations: Smithson had to notify administration when alternate work area was being used; notify administration when using flex duty reporting time; could be seated most of the time; notify administration of an anxiety attack; supervisor will communicate performance concerns; employee will notify of need to be excused from frustrating situations; continued use of memory aids; and extra time to complete tasks. (Id). Smithson's supervisor did inform Smithson that first period planning periods could not be guaranteed, although they had never been denied or rescinded. (Dkt. 35-11 at 7; Dkt. 35-16 at 1).

In 2017, there was a change to the Master Schedule that would require Smithson to teach five sections of the same subject. (Dkt. 35-11 at 3). On August 28, 2017, DODEA offered Smithson other classes to teach, but kept her flexible reporting time accommodation in place (Id.).

On or about May 8, 2018, DODEA held an interactive meeting. (DKT. 35-13).

Smithson did not understand the need for an interactive meeting because she was not asking to modify her accommodations, just to update them. (DKT. 35-13 at 2).

On August 6, 2018, DODEA approved the following accommodations: (1) a flexible duty reporting time, but indicated that Smithson would have to use sick leave for this accommodation; (2) to be seated in the classroom; (3) reviewed and provided performance feedback quarterly; (4) provide extra time for tasks to be assessed on a project/product by project/product basis; (5) principal agreed to do his best to assign the same teaching schedule to Smithson; (6) technology requests would be approved if the DODEA had the products available. (Dkt. 35-11 at 1).

On September 5, 2018, Villareal reiterated that Smithson was allowed to use her delayed start of two hours when her medical condition limited her ability to perform her duties, but that she had to use her personal sick leave time as part of her reasonable accommodation. (Dkt. 35-16 at 2).  Smithson responded by informing Villareal that since 2010, she had received the accommodation of starting her workday at home (as she had used her first period as prep time at home where she could control the environment). (Dkt. 35-16 at 2).  In his deposition, Villareal admitted that prior to September 2018, Smithson's use of her first period as a prep period, and flexible duty reporting time were part of her reasonable accommodation. (Dkt. 44-6 at 17:15-25).

E.  DODEA's November 6, 1987 Leave Policy

DODEA has an Absence and Leave Policy which has the following excerpts:

(a) Section B- Scheduling and Approving Leave Requests. The approval or disapproval of requests for leave is it management's discretion. Once any purpose leave is approved by management, the approval will not be withdrawn except for good cause. (Dkt. 35-17 at 6).

(b) Section E- <u>Medical Certification</u>. Medical certificates may be required to support absences for illness or for maternity purposes when an absence exceeds 3 days or for shorter periods when there is reasonable cause to believe that the leave privilege has been abused. (Dkt. 35-17 at 7).

(c) Section F- <u>Minimum Units</u>- The minimum unit of paid leave, leave without pay, or absence without leave is one-half day. (Dkt. 35-17 at 7).

In August/September 2018, Villareal informed Smithson that she would have to use personal sick leave in order to exercise her flexible duty report time accommodations. (Dkt.35-16 at 2). In September 2018, Villareal also indicated that pursuant to the Absence/Leave Policy, Smithson would have to use a minimum of a half-day of her personal leave time to account for time she had been using as a reasonable accommodation. (Dkt. 44-6 at 17, Villareal Dep. 62:1-4). Villareal admitted in his deposition that prior to September 2018, Smithson had not been required to take half day leave as part of her reasonable accommodation. (Dkt. 44-6 at 17; Villareal Dep. 62:19-21).   In fact, Villareal had participated in the approval of Smithson's flexible duty reporting time prior to 2018. Dkt. 44-2 at 32; Villareal Dep. 128:4-11).

In his deposition, Villareal shared that he thought Smithson's missing out on collaboration with peers, and not attending some trainings, created hardships for DODEA. (Dkt. 44-2 at 33). Villareal also had concerns about Smithson's ability to conduct parent-teacher conferences, which generally started in the morning, and she "might" not be there. (Dkt. 44-2 at 33-34). However, he also admitted that during the first year he was there (2016), there was no designated collaboration time. (Dkt. 44-2 at 33). During his first and second years (2016/2017) teachers collaborated with other teachers who had common planning periods. (Dkt. 44-2 at 39).

10

Smithson could have collaborated with other educators and teachers at other times, as she was a very conscientious teacher. (Dkt. 44-2 at 39-40). As of the time of Villareal's deposition in April 2020, the collaboration time had been designated as Thursday afternoons. (Dkt. 44-2 at 38). Smithson could also arrange the parent-teacher conferences at other times. (Dkt. 44-2 at 35). Villareal did not have any complaints from parents about Smithson's availability, he never told Smithson that she failed to meet her obligations with respect to attending training, and he did not keep track of the number of alleged trainings she missed. (Dkt. 44-2 at 36, 37, 40). Villareal also never shared these concerns with Smithson. (Dkt. 44-2 at 34, Villareal Dep. 130:23-24). Smithson was also never told that using her flex time or first period prep time presented a hardship to the agency until her accommodations she was asked to use sick leave in 2018. (Dkt. 35-1 at 285; Smithson Dep. 285:11-18). Villareal also admitted that he never told Smithson that her disability posed a problem in performing her duties. (Dkt. 44-1 at 16).

## SUMMARY OF THE ARGUMENT

The District Court erred in granting summary judgment to the DODEA. The District Court stood in the role of fact finder by weighing the evidence and by drawing inferences in the light most favorable to the DODEA, and in so doing, and disregarded Smithson's consistent track record of performing the essential functions of her position. More importantly, DODEA failed to show that adhering to the reasonable accommodation that Smithson had had for years, actually presented an undue hardship.  When the facts are viewed in the light most favorable to Smithson, a reasonable jury could have easily found in her favor.

## ARGUMENT

### Standard of Review

The appellate court reviews the district court's summary judgment ruling de novo. *Abdullahi v. City of Madison,* 423 F.3d 763, 769 (7th Cir. 2005). The district court, when deciding summary judgment, cannot make "credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for the fact finder." *Paz v. Wauconda Healthcare & Rehab Ctr., LLC,* 464 F.3d 659, 664(7th Cir. 2006)(quoting *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003)). "Summary judgment is not appropriate if a reasonable jury could just as easily return a verdict for the non-moving party." *Paz*, 464 F.3d 659, 664 (7th Cir. 2006)(citing *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 248 (1986). The court's task on review is to determine whether there are any issues of material fact that require a trial. *Waldridge v. Am. Hoechst Corp*., 24 F.3d 918, 920 (7th Cir. 1994). On review, the court must review the evidence in the light most favorable to the plaintiff. *Paz*, 464 F.3d 659, 664 (7th Cir. 2006).

## I.    THE DISTRICT COURT ERRED BY RUBBER STAMPING THE EMPLOYER'S ALLEGED ESSENTIAL FUNCTIONS

The Seventh Circuit looks to the standards applied under the Americans with Disabilities Act, as amended, 42 U.S.C. §12112, et seq. to determine whether a violation of the Rehabilitation Act has occurred. *Branham v. Snow*, 392 F. 3rd 896, 902 (7th Cir. 2014). To establish her disability claim, Smithson must first prove that she had a disability. *DePaoli v. Abbot Labs*, 140 F.3d 668, 672 (7th Cir. 1998). To establish a disability, Smithson must show that: (1) she has a physical or mental impairment that substantially limits a major life activity; (2) she has a record of such an impairment; or (3) the employer regarded her as disabled. 42 U.S.C. §12102(4)(A). To be substantially limited means to be limited in abilities such as the ability to

care for oneself, perform manual tasks, see, hear, eat, speak, walk, stand, lift, bend, or work.  42 U.S.C. §12102(2)(A).

A.  Smithson's Disability

As early as 2010, Smithson informed DODEA of her disabilities when she requested numerous reasonable accommodations. Smithson also detailed the effects of her disability in the accommodation requests. Based on Smithson's physical impairments, and the substantial limitations in her vision, speech, memory, and to her ability to walk, drive, and stand, she is disabled.

DODEA had an extensive record of Smithson's impairments. Smithson requested accommodations in 2010, 2014, 2015, and 2017/2018. The DODEA required medical documentation to support each request. Smithson provided medical documents to support each of her requests.

Lastly, DODEA clearly regarded Smithson as disabled as it continuously processed her requests for accommodations.  Moreover, DODEA never refuted or questioned the validity of Smithson's disabilities.

B.  DODEA Failed to Accommodate Smithson

In order for Smithson to prevail on her failure to accommodate claim, she must establish that (1) she is a qualified individual with a disability; (2) the defendant was aware of her disability; and (3) the defendant failed to accommodate her.  *EEOC v. Sears Roebuck & Co.*, 417 F.3d 789, 797 (7th Cir. 2005).

To be a qualified individual with a disability, Smithson must be able to perform the essential functions of the job, with or without a reasonable accommodation.  42 U.S.C. §12111(8).

13

Smithson is a qualified individual with a disability who can perform the essential functions of her position with an accommodation. As Villareal testified, Smithson has never had any problems performing the functions of her position.  She has had a disability continuously since at least 2010 and she has continued to perform her teaching responsibilities without any deficiencies in her performance.

Despite the lack of any citations for performance deficiencies, the District Court concluded that Smithson was not a qualified individual with a disability. (Dkt. 48 at 17). The court argued that collaborating with peers and attending trainings were essential functions of Smithson's teaching position[4]  that she was unable to perform.  (Dkt. 48 at 12). The court combed the record and deferred to Villareal's testimony on what constituted an essential function (Id)  While the courts are discouraged from second-guessing the employer's judgment on which functions are essential, the Seventh Circuit has made it clear that courts "should not merely rubber-stamp and employer's designation of what functions are essential. *Nicholas v. Acuity Lighting Group*, 2005 U.S. DIST. LEXIS 1645 *26-27 (S.D. Ind. January 4, 2005).  For ADA purposes, the employer's judgment should be "considered," but not deferred to, and certainly not rubber stamped. *Id*. at *27.  The essential functions do not include "marginal functions of the position." *Id.* Evidence about the way the job is actually performed can support a different conclusion. *Id*. at *33 (citing *Rel v. Electronic Data Systems Corp*., 99 F.3d 678, 683 (5th Cir. 1996).

Villareal identified collaborating with peers and attending training as essential functions of the position, but in his discussion about whether these areas also presented hardships, Villareal

---

[4] The DODEA, in its summary judgment brief relied on attendance in general as an essential function. (Dkt. 36 at 32-33). It mentioned that "Plaintiff was expected to use her planning period to collaborate with others or conduct ad hoc instruction when school was in session. (Dkt. 36 at 33). DODEA did not advance collaboration as an essential function in its summary judgment brief, although the District Court advanced this position on its behalf.

admitted that Smithson could collaborate with educators at other times, and that he never approached her about concerns any deficiencies in completing training, nor did he even keep track of how many, or whether she missed any trainings.  Although at litigation hour, these functions have been deemed as essential, they were not so deemed prior to litigation, and they were not important enough to bring to Smithson's attention.

The District Court also relied on the *Basith v. Cook County* case for the proposition that an employer should not be penalized for being too generous in providing a reasonable accommodation. (Dkt. 48 at 16).  The *Basith* case is substantially different in that the employee's main functions as a Pharmacy Technician were to deliver and stock medications. *Basith v. Cook County*, 241 F.3d 919, 924 (7th Cir. 2001). The employer restructured the employee's job and completely eliminated the main functions, by removing delivering and stocking.  Id. at 925. Teaching is the main, principal part of Smithson's position, and it was never removed. (Dkt. 4401 at 17, Villareal Dep. 17:13-15).  Similarly, to the extent that collaborating and training were essential functions, Smithson found ways to accomplish those tasks.

In this case, Smithson had the same reasonable accommodations for years, including the accommodation of having a flexible start time, as well as having a first period prep time.  (See Dkt. 35-10 at ¶3 ("Continued flexibility with reporting time in cases of migraines, dizziness, and nausea in the early morning hours.)"; See also Dkt. 35-11 at 5 ("Having extra time (flexible reporting time) to prepare in the morning has been a huge help over couple of years" (August 2015 Reasonable Accommodation Request); See also Dkt.. 35-11 at 9 ("Ms. Smithson will notify administration by calling the Main Office when utilizing the flexible duty reporting time- due to migraines, dizziness and nausea in the early morning hours." (October 2016 Reasonable Accommodation Approval)). Even in the 2018 Response to Reasonable Accommodation

Request (DKT. 35-11 at 1), DODEA approved the use of a flexible duty reporting time (up to 2 hours daily), but then adds the caveat that Smithson is approved to use sick leave during this accommodation.  This requirement was never previously imposed.

Defendant claimed that the DODEA Absence and Leave Policy, dated November 6, 1987, required Smithson to use her personal sick leave time as part of her reasonable accommodation. (DKT. 37-11 ¶ F). This policy has been in place for all the years that Smithson was consistently granted flexible report to duty time.  However, in August 2018, after some eight years of Smithson's using flexible reporting time, as well as first period prep time as a reasonable accommodation, Defendant insisted that Smithson use her personal sick leave time as a reasonable accommodation. Like all jobs, sick leave is available to anyone who accrues it. Smithson had been with DODEA since 2004, so as a matter of course, she accrued sick time; therefore, DODEA giving her a benefit she already had was not a reasonable accommodation.

"Granting an employee time off from work or an adjusted work schedule as a reasonable accommodation may involve modifying leave or attendance procedures or policies."[5] Smithson's situation is akin to scenarios presented in *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391 (2002). In *Barnett,* the court's ultimate ruling had to do with whether reasonable accommodations are affected by a seniority system; however, in reaching its conclusion that court analyzed the role of a reasonable accommodation. *Id*. The court recognized that by definition, "any special 'accommodation' requires the employer to treat an employee with a disability differently, i.e., preferentially." "[T]he fact that the difference in treatment violates an employer's disability-

---

[5] See Enforcement Guide on Reasonable Accommodation and Undue Hardship Under the ADA, Modified Work Policies ¶24.  https://www.eeoc.gov/laws/guidance/enforcement-guidance-reasonable-accommodation-and-undue-hardship-under-ada#N_71   See also 42 U.S.C. 12111(9)(B)("reasonable accommodation may include appropriate adjustment of modification of policies.

neutral rule cannot by itself place the accommodation beyond the Act's potential reach." *Id.* at 397.   The court goes on further to state that if that were the case, that disability-neutral policies should be applied uniformly to persons with disabilities, the reasonable accommodation provision could not achieve its intended objective. *Id.*  The court then provides examples of policies that have to be modified to accommodate persons with disabilities, including neutral office assignment rules may require the employer to place the employee on the ground floor, or neutral break-from-work policies may require an employer to provide additional breaks.  *Id.* at 398.  Therefore, Smithson should have been allowed to continue with her flexible duty report time, as she had done for years, despite the Absence and Leave Policy.

The ADA requires an employer to make reasonable accommodations for a disabled employee unless doing so would impose an undue hardship on the employer." 42 U.S.C. §12112(b)(5)(A). DODEA argues that providing Smithson with the flexible reporting time presents an undue hardship although they have provided it as an accommodation for the last eight years. Similarly, the DODEA is willing to provide the accommodation if Smithson uses her sick time, but not if she wants to use it as a pure accommodation without penalty.  DODEA's Absence and Leave Policy gives management discretion to grant leave as appropriate and allows employees to use medical certifications to justify medically-related leave.  (Dkt. 35-17 at 6, 7). The policy also states that leave cannot be withdrawn without good cause. (Dkt. 35-17 at 6).  DODEA cannot rely on a hardship argument when they in fact are allowing the flexible leave, but simply want Smithson to exhaust her accrued sick time to receive the accommodation. DODEA has not presented any evidence to support an undue hardship.

## II.     DISTRICT COURT ERRED IN FINDING SMITHSON UNQUALIFIED AND IGNORING HER DISABILITY CLAIM

Smithson also makes a claim for disparate treatment. To prevail on her disparate treatment disability claim, Smithson must establish: (1) she is disabled; (2) she is qualified to perform the essential functions of her job with or without an accommodation; (3) she suffered an adverse employment action; and (4) the circumstances suggest that the plaintiff's disability was the reason the employer took adverse action against her. *Timmons v. GMC*, 469 F3d 1122, 1126 (7th Cir. 2006). The last prong can be substituted when a plaintiff does not have similarly situated comparators. *Timmons,* 469 F.3d 1122, 1126 (*citing Lawson v. CSX Transp. Inc.,* 245 F3d 916, 922 (7th Cir. 2001)). It simply requires a showing that there are circumstances surrounding the adverse action indicate that it is more likely than not that disability was the reason for the action. *Id.* Smithson has already established the first and second elements of her disability claim.  The outstanding elements are whether Smithson experienced an adverse employment action and whether there is an indication that the action taken against her was based on her disability.

An adverse employment action is more than "a mere inconvenience or an alteration of job responsibilities." *Traylor v. Brown*, 295 F3d 783, 788 (7th Cir 2002). A materially adverse change may be a termination in employment, a demotion accompanied with a decrease in salary, a less distinguished title, a material loss of benefits, or other indices that might be unique to a particular situation. *Id.*  Courts have found that under certain circumstances, even lateral transfers, where salary and benefits remain steady, can be adverse employment actions when the positions are objectively inferior and involve less skill, independence, and the working conditions are harsher.  *See Williams v. Lovchik*, 830 F. supp 2d 604, (S. D. Ind. 2011)(adverse employment action found where position was objectively inferior, involved less independence

and skill, but pay remained the same).  Within the Seventh Circuit, the scope of actions that may

fall within the definition of an adverse employment action has been broadened.

When Smithson was denied a reasonable accommodation, she suffered a loss in sick leave

because she was forced to use her own sick leave. *See Timmons*, 469 F.3d 1122, 1128 (7th Cir

2006)(placing plaintiff on disability leave even though he received the equivalent to his old

salary through social security benefits was an adverse action).  The court recognized similar

findings in other circuits: *See Dilettoso v. Potter* No. CV 04-0566-PHX-NVW, 2006 U.S. Dist.

LEXIS 2973 *8 (D. Ariz. January 25, 2006 (holding plaintiff suffered adverse employment

action when he was placed on administrative leave for nine months and missed the opportunity

to earn $1,000 bonus); *Bush v. Am. Honda Motor Co Inc.,* 227 F. Supp 2d 780, 790 (S.D.

2002)(plaintiff could not show adverse employment action when her demotion did not result in

loss of income or benefits or opportunity to receive future bonus or promotion)).

The answer to whether Smithson lost opportunities based on her disability is clear. DODEA

refused to allow a reasonable accommodation and instead punished her by requiring her to take

sick leave.

## **<u>CONCLUSION</u>**

The district court disregarded the genuine issues of material fact that demonstrate

disability discrimination and a failure to accommodate by failing to draw all inferences in

Smithson's  favor and viewing the evidence in the light most favorable to the DODEA.

For the foregoing reasons, the judgment of the District Court on Defendant's Motion for

Summary Judgment must be reversed, and the case remanded to the District Court for trial.

19

Dated: December 1, 2022                    Respectfully submitted,

                                           Tamica Smithson
                                           Appellant

                                           By*: s/Robin C. Clay*
                                           Robin C. Clay
                                           Attorney for Appellants
                                           Curlin & Clay Law, Association of Attorneys
                                           8510 Evergreen Ave Suite 200
                                           Indianapolis, IN 46204
                                           Tel: (317) 202-0301
                                           rclay@curlinclaylaw.com


                         CERTIFICATE OF COMPLIANCE

        Pursuant to Federal Rule of Appellate Procedure 32(g), I hereby certify that this brief

complies with the type-volume limitation of Rule 32(a)(7) inasmuch as it does not exceed 13,000

words. The length of this brief is 5,182 words.



Dated:  December 1, 2022                    By: *s/Robin C. Clay*
                                           Robin C. Clay
                                           Attorney for Appellant
                                           Curlin & Clay Law, Association of Attorneys

CERTIFICATE OF COMPLIANCE WITH RULE 30(d)

Pursuant to Circuit Rule of Appellate Procedure 30(d), I hereby certify that an appendix

with all materials required by Circuit Rule 30(a) and 30(b) has been submitted.

By: _s/Robin C. Clay_
Robin C. Clay
Attorney for Appellants
Curlin & Clay Law, Association of Attorneys

Case No.22-2566

_____

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE SEVENTH CIRCUIT

_____


TAMICA SMITHSON,

       *Appellant,*

v.


LLOYD AUSTIN, Secretary
of Defense, Department of Defense
       *Appellee.*

_____

Appeal from the United States District Court
for the Southern District of Indiana
Case No.: 1:20-cv-03021-JRS-MJD
The Honorable Judge James R. Sweeney, II

_____

APPELLANTS' SHORT APPENDIX

_____


    Robin C. Clay
*Counsel of Record*
Curlin & Clay Law, Association of Attorneys
8510 Evergreen Avenue, Suite 200
Indianapolis, IN 46240
(317) 202-0301
rclay@curlinclaylaw.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| TAMICA SMITHSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:20-cv-03021-JRS-MJD |
| | ) | |
| CHRISTOPHER C. MILLER, acting United | ) | |
| States Secretary of Defense, Department of | ) | |
| Defense, | ) | |
| | ) | |
| Defendant. | ) | |

**Order on Motion for Summary Judgment**

The Department of Defense Education Activity ("DoDEA") operates schools across the world for children of military families. (Villareal Decl. ¶ 1, ECF No. 35-2.) Plaintiff Tamica Smithson contends that while she was a teacher at one such school, DoDEA discriminated against her because of her race and disability, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and the Rehabilitation Act, 29 U.S.C. § 701 *et seq.* Currently before the Court is DoDEA's Motion for Summary Judgment. (ECF No. 35.) For the following reasons, DoDEA's Motion is **granted**.

**Legal Standard**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute about a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict" for the non-moving

party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). If no reasonable jury could find for the non-moving party, then there is no "genuine" dispute. *Scott v. Harris*, 550 U.S. 372, 380 (2007). The Court views the evidence "in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted). The Court need consider only materials cited by the Parties but may also consider other materials in the record. Fed. R. Civ. P. 56(c)(3).

## Discussion

Smithson is African American, (Compl. ¶ 7, ECF No. 1), and DoDEA does not dispute that she has a disability, (Smithson Decl. 5–6, ECF No. 44-5; Def.'s Br. 31–32, ECF No. 36 (arguing Smithson was not a "qualified individual with a disability" because she was not qualified)). Smithson contends (1) she was subjected to a hostile work environment based on her race and disability, (2) DoDEA failed to accommodate her disability, (3) DoDEA discriminated against her because of her disability, and (4) DoDEA improperly disclosed her medical information.[1] The Court addresses each claim in turn.

### A. Hostile Work Environment

To state a claim for discrimination based on a hostile work environment, a plaintiff must show that (1) she was subject to unwelcome harassment; (2) the harassment was because of the plaintiff's membership in a protected class—here, race or disability; (3) the harassment was so severe or pervasive as to alter the conditions of

---

[1] Smithson withdrew any claim for retaliation. (Pl.'s Resp. 12 n.1, ECF No. 45.)

2

employment and create a hostile or abusive working environment; and (4) there is a basis for employer liability. *Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 900 (7th Cir. 2018) (harassment based on race); *Ford v. Marion Cnty. Sheriff's Off.*, 942 F.3d 839, 856 (7th Cir. 2019) (quoting *Johnson*, 892 F.3d at 900) (harassment based on disability). As to the final prong, when harassment is committed by the plaintiff's co-workers, the employer is liable only if it was "negligent either in discovering or remedying the harassment." *Ford*, 942 F.3d at 856 (quoting *Nischan v. Stratosphere Quality, LLC*, 865 F.3d 922, 930 (7th Cir. 2017)).

Smithson cites a host of incidents in support of her harassment claim. Smithson believed that special education aides who were assigned to work with students in her classroom were watching her and reporting back to the administration, (Smithson Dep. 33–48, ECF No. 35-1); she believed a white staff member had recorded her once as she was walking into the building, because the staff member had her phone pointed at Smithson but was not using it, (*id.* at 102–104; ECF No. 35-3 at 3); another white staff member entered Smithson's classroom and observed her at least twice, even though it was not part of his responsibilities to do so, which led students to lack confidence in Smithson's teaching capabilities, (Smithson Dep. 106–12, ECF No. 35-1; ECF No. 35-3 at 3); Smithson's classroom was disrupted more frequently than other teachers' by counselors entering to talk to students and by telephone calls from the front office—although these interruptions always had a purpose, but, in Smithson's view, those purposes did not need to be addressed while she was teaching, (Smithson Dep. 53–58, ECF No. 35-1); after Smithson offered to teach one student chemistry

while she taught the rest of the class biology, the school counselor told Smithson and the student that the student needed to be in a "real chemistry class," that is, "a class where there were other [chemistry] students in it," although the student was ultimately placed in Smithson's class, (*id.* at 116–26); students dropped Smithson's class and took a white teacher's class instead, and Smithson believed this happened because that teacher's "demeanor" gave off the impression that he was a better teacher, (*id.* at 127–30); once during a fire drill, another teacher "bumped into [Smithson] really hard," (*id.* at 130–36); during a school play, while Smithson was propping a door open to make a phone call, the teacher who had previously bumped into Smithson said the door needed to be closed due to a draft and pulled the door shut, causing Smithson's hand to get stuck in the door, (*id.* at 147–56); and when Smithson was sitting in the back of the room during a training because the brighter lights in the front of the room were bothering her, a staff member insisted that Smithson sit in the front, picked up Smithson's desk to move it to the front, and hit Smithson's leg with the desk in the process, (*id.* at 95–101).

The Court is skeptical that these incidents amount to "severe or pervasive" harassment, but even assuming they do, Smithson's harassment claim cannot survive summary judgment for two reasons.  First, there is insufficient evidence to show that these incidents occurred "based on" Smithson's race or disability.  Smithson's belief that these incidents took place because of her race or disability is supported by nothing more than speculation, which is insufficient to survive summary judgment. *Springer v. Durflinger*, 518 F.3d 479, 484–86 (7th Cir. 2008) ("Here, all the plaintiffs

have to go on is a collective hunch about the defendant's motives, which in itself will not survive a motion for summary judgment."); *Herzog v. Graphic Packaging Int'l, Inc.*, 742 F.3d 802, 806 (7th Cir. 2014) (quoting *Tubergen v. St. Vincent Hosp. & Health Care Ctr.*, 517 F.3d 470, 473 (7th Cir. 2008)) ("inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion"). When asked why she believed these things happened because of her membership in a protected class, Smithson repeatedly stated it was just what she "felt" or "thought." (Smithson Dep. 51, ECF No. 35-1 ("That's just how I felt."); *id.* at 63 ("They just felt like they could [harass me] because of my race."); *id.* at 100 ("Because she's a white female and she probably felt that she could, you know, do something like that and get away with it against a black female."); *id.* at 139–40 (testifying that she believed the bumping incident occurred based on her race because of "[t]he environment.  It's just the environment and the feel that I get from, you know, just with things like this.  I don't think that Miss Conners goes around slamming anyone else's hand and bumping into people, you know.").)  This sort of "speculation as to an employer's [or co-workers'] state of mind is not sufficient to create an issue of material fact." *Johnson*, 892 F.3d at 899 (African American plaintiff's race discrimination claim failed when his only evidence was his testimony that his supervisors nitpicked him and would not do the same with "white people or Polish people" and that they only did so with "black people"); *Springer*, 518 F.3d at 484–86 (plaintiffs' speculation and "complete lack of evidence" as to defendant's retaliatory motive was demonstrated by

5

their testimony: "my common sense [told me]" it was retaliation, "I felt that was obvious," etc.).

Second, there is no basis for employer liability, as DoDEA was not "negligent either in discovering or remedying the harassment." *Ford*, 942 F.3d at 856 (quoting *Nischan v. Stratosphere Quality, LLC*, 865 F.3d 922, 930 (7th Cir. 2017)). Principal Villareal took appropriate action in response to Smithson's complaints. He reassured her that special education aides were not sent to spy on her, (Smithson Dep. 45–46, ECF No. 35-1; Villareal Decl. ¶ 5, ECF No. 35-2), and that the white staff member had not recorded her walking into the building, (ECF No. 35-3); he told the white teacher who entered Smithson's classroom to observe her to stop doing so, (Villareal Decl. ¶¶ 10–11, ECF No. 35-2); he met with office staff to clarify expectations as to when classroom instruction should be interrupted by counselors or telephone calls, (ECF No. 35-3 at 1); he instructed the school counselor who had said the student needed to be in a "real" chemistry class not to use any language "that could be perceived as berating" or as "questioning [Smithson's] judgment or capabilities" and ensured that the student was placed in Smithson's class, (Villareal Decl. ¶ 12, ECF No. 35-2; ECF No. 35-3 at 1); he investigated and spoke with the teacher who bumped into Smithson during the fire drill, (Villareal Decl. ¶ 13, ECF No. 35-2); in response to Smithson's hand getting slammed by the door at the school play, Villareal promptly spoke with over seven witnesses, concluded the teacher did not slam Smithson's hand on purpose, nevertheless instructed the teacher to do all she could to avoid physical contact with Smithson, and informed Smithson of his findings, (Villareal Decl. ¶¶ 14–

6

17, ECF No. 35-2; ECF No. 35-5; ECF No. 35-6); and he told the staff member conducting the training session to let Smithson sit in the back of the room where it was darker if she wanted, (Villareal Decl. ¶ 8, ECF No. 35-2). Given these responses, no reasonable jury could find that DoDEA was negligent in remedying any harassment. *Williams v. Waste Mgmt. of Ill.*, 361 F.3d 1021, 1029 (7th Cir. 2004) (quoting *Tutman v. WBBM-TV, Inc./CBS, Inc.*, 209 F.3d 1044, 1048 (7th Cir. 2000)) ("Put differently, 'the employer can avoid liability for its employees' harassment if it takes prompt and appropriate corrective action reasonably likely to prevent the harassment from recurring.'"); (ECF No. 35-6 at 3, 5 (witness statements provided Monday, March 5, 2018, four days after slamming-door incident happened).) DoDEA is entitled to summary judgment on Smithson's harassment claim.

## B. Failure to Accommodate

Next, Smithson asserts that DoDEA failed to reasonably accommodate her disability. To establish a failure-to-accommodate claim under the Rehabilitation Act, Smithson must show that (1) she is a "qualified individual with a disability," (2) DoDEA was aware of her disability, and (3) DoDEA failed to reasonably accommodate her disability. *Gratzl v. Off. of Chief Judges of 12th, 18th, 19th, & 22nd Jud. Cirs.*, 601 F.3d 674, 678 (7th Cir. 2010) (quoting *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 797 (7th Cir. 2005)).

DoDEA provided Smithson with numerous accommodations over the years, but the Court addresses only the one that led to this dispute: Smithson's 2018 request for a "[f]lexible duty reporting time (up to two hour delay)," that is, to begin work up to

two hours past the normal reporting time.  (ECF No. 35-20.)  Ultimately, DoDEA approved this request, but did so under the condition that Smithson use sick leave for such absences.  (ECF No. 35-11 at 1.)  Smithson takes issue with the sick-leave requirement.  Her argument appears to be that arriving two hours late without taking sick leave was a reasonable accommodation because she had that accommodation in the past.  (ECF No. 35-16 at 1; Pl.'s Resp. 16, ECF No. 45 ("Smithson should have been allowed to continue with her flexible duty report time, as she had done for years, despite the Absence and Leave Policy."); Pl.'s Surreply 2, ECF No. 47 ("The evidence shows that the school has consistently accommodated Plaintiff with the same accommodations throughout the years.  The change is that Defendant now wants Plaintiff to use sick leave as an accommodation.").)  To better assess Smithson's failure-to-accommodate claim, the Court briefly lays out the history of Smithson's accommodations:

- Smithson initially requested a flexible reporting time accommodation in 2010. (ECF No. 35-11 at 15–16.)  She represented that she would not need this accommodation every morning, that it would be limited in scope (she gave coming in fifteen minutes late as an example), and that she would make up the missing time at the end of the day.  (Smithson Dep. 196–97, ECF No. 35-1; ECF No. 35-11 at 15.)

- In 2014, Smithson sought additional accommodations and noted that having her first period be her designated prep period, in which she prepared for the day and

8

did not instruct students, had been a "big help" over the last two years.  (ECF No. 35-11 at 18.)

- In 2015, in addition to other accommodations, Smithson again sought "[f]lexible duty reporting time" and reiterated that having her prep period first had been a big help.  (ECF No. 35-11 at 9.)  DoDEA responded that the first hour prep period could not be guaranteed due to the school's needs.  (*Id.* at 7.)  DoDEA granted Smithson's request for flexible reporting time but stated that Smithson must notify the administration when utilizing it, (*id.* at 9), although Smithson stated she was unaware she needed to notify anyone if she was going to be late, (Smithson Dep. 213–16, ECF No. 35-1).

- In 2017, in addition to other accommodations, DoDEA accommodated Smithson with "[c]ontinued first period planning period" and "[c]ontinued flexibility with reporting time."  (ECF No. 35-11 at 3.)

- In 2018, DoDEA requested additional clarification and medical documentation to support Smithson's requested accommodations.  (ECF No. 35-14.)  In pertinent part, DoDEA requested that Smithson submit medical documentation to substantiate the need for the flexible reporting time and to "define the parameters" of the flexible reporting time.  (*Id.* at 1.)  Smithson submitted a doctor's note requesting the "two-hour delay" that is at issue.  (ECF No. 35-20 at 1.)  DoDEA approved this request under the condition that Smithson use sick leave.  (ECF No. 35-11 at 1.)  Smithson responded that she "ha[d] not reported to work by 0800hrs [the typical starting time] since 2010; as per my approved

reasonable accommodations.  As my condition has worsened, the length of time has only increased."  (ECF No. 35-16 at 1.)  It is undisputed that Smithson's medical condition worsened over time since 2010, and that Smithson planned to be late every day in 2018.  (*Id.*; ECF No. 35-15; Smithson Dep. 248, ECF No. 35-1.)  It is not entirely clear, however, how often and how late she had arrived at school in the past.  For example, after Smithson indicated she would be late every day in 2018, Villareal responded that he was "concerned" that Smithson "d[id] not expect ever to arrive to school by the start of the duty day at 8:00 a.m." and that it was essential for her to perform her duties during the established times of the school day, (ECF No. 35-16 at 2), which suggests this was a change in Smithson's attendance.  (*But see* Smithson Dep. 236–37, ECF No. 35-1 (testifying that her doctor's 2018 request that she continue to work from home during her first period prep was "exactly what [she] had been doing" already).)

Ultimately, though, it does not matter.  Either way, to be entitled to a reasonable accommodation at all, Smithson "bears the burden of proving that she is a 'qualified individual with a disability'—that is, a person 'who, with or without reasonable accommodation, can perform the essential functions' of her job."  *McAllister v. Innovation Ventures, LLC*, 983 F.3d 963, 967 (7th Cir. 2020) (quoting *Cleveland v. Pol'y Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999)); *see also Gratzl*, 601 F.3d at 681.  She cannot make this showing.

Smithson argues, in broad terms, that she could perform the essential functions of her position with an accommodation.  (Pl.'s Resp. 14, ECF No. 45.)  She notes that

she has had a disability since 2010 and has taught since then without any problems, citing Villareal's testimony that he never indicated that Smithson was deficient when completing her performance evaluations and that she had a fully successful performance record.  (*Id.* (citing Villareal Dep. 16, 54–55, ECF No. 44-1).)  While Villareal testified that he never thought Smithson's disability interfered with her ability to do her duties while she was at school, he also said that when Smithson "is unable to come to work, then she can't perform" her duties.  (Villareal Dep. 16–17, ECF No. 44-1.)  Further, it is undisputed that the scope of Smithson's request changed at some point in time after 2010—by 2018, she was seeking to arrive two hours late every day.  The question boils down to whether attending the first two hours of school was an essential function of Smithson's job.

Evidence of whether a function is essential "includes, but is not limited to," the employer's judgment as to which functions are essential, written job descriptions, the amount of time spent performing the function, the consequences of not requiring the individual to perform the function, the terms of a collective bargaining agreement, and the experience of those who previously or currently hold the position.  29 C.F.R. § 1630.2(n)(3); *Bilinsky v. Am. Airlines, Inc.*, 928 F.3d 565, 569 (7th Cir. 2019). "Although we look to see if the employer actually requires all employees in a particular position to perform the allegedly essential functions, we do not otherwise second-guess the employer's judgment in describing the essential requirements for the job." *Bilinsky*, 928 F.3d at 570 (quoting *DePaoli v. Abbott Lab'ys*, 140 F.3d 668, 674 (7th Cir. 1998)).

11

Villareal stated that working during school hours, collaborating with peers, and attending trainings were essential functions of a teacher's job. (Villareal Dep. 17–18, ECF No. 44-1; *see also* ECF No. 35-16 at 2 ("In your position as a science teacher at our school, it is essential for you to perform your duties during the established times of the school day when you are on duty.  Even if you begin your day with a planning period, you may be needed to receive training, collaborate with colleagues or otherwise conduct ad hoc instruction from the very beginning of the school day."); ECF No. 35-18 at 2 ("I am sympathetic to the early morning symptoms described by you and your doctor but the duties required of you during your planning time mean that you must be present at school.  Your planning period often may include collaboration with other faculty, training and professional development, or other ad hoc instructional duties. . . . I appreciate your willingness to extend the school duty day . . . [but] [t]he duty times of the school day are fixed and directly connected to our responsibilities to instruct and supervise students within the established school day.").)  Villareal testified that a teacher's prep period should be spent performing the many essential functions beyond simply providing instruction to students in the classroom: communicating with parents, collaborating with colleagues, grading papers, setting up lesson plans, setting up and cleaning up labs, and so on. (Villareal Dep. 133–34, ECF No. 44-2.)  Smithson's school completed training and collaboration activities during each teacher's prep period.  (*Id.* at 129–30, 137.)  These trainings were mandatory for all teachers, (*id.* at 134, 137), and there is no evidence to suggest that other teachers were not required to attend, *Bilinsky*, 928 F.3d at 570 ("we look

to see if the employer actually requires all employees in a particular position to perform the allegedly essential functions"). "[G]enerally, Ms. Smithson was not able to attend those because her planning period was always first thing in the day. So she was missing out on vital training there, she was missing out on collaboration." (Villareal Dep. 129–30, ECF No. 44-2.) Villareal continued that even if Smithson collaborated with colleagues outside of the prep period, the prep-period-specific training and collaboration "would be impossible to replicate": guest speakers came, the superintendent led one of the sessions, and so on. (*Id.* at 136.)

Villareal continued, noting there were "a number of growing situations where that time when [Smithson] was not in the building just could not be reproduced and she was not able to collaborate and perform very essential functions of her job." (*Id.* at 130.) He noted there were "a number of times" that the school had an alternate schedule—meaning first period was not Smithson's prep period as it normally was—and the school had to secure a substitute because Smithson could not be there. (*Id.*) When there were all-day trainings, Smithson missed portions of them. (*Id.* at 133.) "Parent-teacher conference days generally started first thing in the morning and Ms. Smithson might not have been able to be there."[2] (*Id.* at 130.) Further, and perhaps

---

[2] In Villareal's deposition, Smithson's counsel made much ado about whether Villareal documented these concerns in writing or actually gave Smithson a negative performance evaluation. (*See, e.g.*, Villareal Dep. 130, ECF No. 44-2 ("[D]id you ever communicate this information [about the number of growing situations where Smithson was not in the building] in writing to Ms. Smithson?"); *id.* at 132 ("Did you have any written documentation that indicates that having conferences with Ms. Smithson posed a problem for any parent? A. We did have parents asking, you know, is Ms. Smithson available and – Q. No, that's not my question, sir. My question is: Did you have any written complaints about Ms. Smithson's availability for conferences?").) But the Court is not aware of any authority that written complaints or deficient performance evaluations are required in light of the evidence that

most tellingly, Smithson herself testified that attendance during school hours is an essential function of being a teacher. (Smithson Dep. 192, ECF No. 35-1.) She further agreed that sometimes teachers need to collaborate during the prep period, that a teacher might need to handle an emergency during the prep period, and that it would not be appropriate for all teachers to work from home during their prep period. (*Id.* at 253–54.) Despite DoDEA emphasizing Smithson's admission that attendance is essential in its opening brief, (Def.'s Br. 33, ECF No. 36), Smithson did not respond to, or otherwise attempt to diminish, this point in her response.

Whether a function is essential is a question of fact, *Tonyan v. Dunham's Athleisure Corp.*, 966 F.3d 681, 687 (7th Cir. 2020), and the evidence here shows that attendance during the first two hours of Smithson's workday was essential. *See Basden v. Pro. Transp., Inc.*, 714 F.3d 1034, 1037 (7th Cir. 2013) ("In response to an employer's motion for summary judgment, it is the plaintiff's burden to produce evidence sufficient to permit a jury to conclude that she would have been able to perform the essential functions of her job with a reasonable accommodation."). That conclusion is consistent with Seventh Circuit caselaw more generally. *Id.* (citation omitted) ("An employer is generally permitted to treat regular attendance as an essential job requirement and need not accommodate erratic or unreliable attendance. A plaintiff whose disability prevents her from coming to work regularly

---

Smithson could not do some essential functions of the job. (*See* Villareal Dep. 16–17, ECF No. 44-1 ("Obviously, teaching is a part of the position and it is the main, the principal part of the position. And Ms. Smithson does that very well. But there are many other parts . . . .")); *Basith, v. Cook County*, 241 F.3d 919, 929 (7th Cir. 2001) ("But an essential function need not encompass the majority of an employee's time, or even a significant quantity of time, to be essential.").

cannot perform the essential functions of her job, and thus cannot be a qualified individual for ADA purposes."); *Yochim v. Carson*, 935 F.3d 586, 591–92 (7th Cir. 2019) (quoting *Bilinsky*, 928 F.3d at 573) (employer's accommodation of allowing employee to telework two days a week, rather than five, was reasonable given the workplace's restructuring and the employee's job description, which focused "on cross-training, teamwork, and collaboration, which necessarily required her presence in the office"; "[a]n accommodation to telework requires a context-specific inquiry, and a 'general consensus [exists] among courts' that jobs 'often require face-to-face collaboration'").

Smithson's only argument to the contrary is: I always had this accommodation and my work performance was acceptable, so I should have been able to continue having it. But Villareal's testimony suggests some of Smithson's work performance was not acceptable. Moreover, the ability to come to work or otherwise perform the essential functions of the job is examined "as of the time of the adverse employment decision at issue." *Basden*, 714 F.3d at 1037. Smithson may have been able to perform the essential functions with a reasonable accommodation—arriving fifteen minutes late on some mornings—in 2010, up until her condition worsened. It is not clear when Smithson started showing up later and later on a regular basis—and Smithson almost appears to lean into this ambiguity to try and create a question of fact. (*See, e.g.*, Pl.'s Surreply 2, ECF No. 47 ("It is not true that there was no change in usage [of Smithson's accommodation] from 2010 to 2017. That fact is in dispute.").) But even if DoDEA had been accommodating Smithson, unwittingly or intentionally,

by allowing her to arrive late and/or to work from home during her prep period, the Seventh Circuit has prohibited plaintiffs from using this sort of argument as a backdoor to show they could do the essential functions or that their previous accommodation was reasonable.  In *Basith v. Cook County*, 241 F.3d 919, 929–30 (7th Cir. 2001), the court rejected a pharmacy technician's argument that delivering medication was not an essential function simply because his employer had previously given him a "special assignment" that did not require him to do deliveries.  The court said that the fact that restructuring a job is feasible is "not persuasive evidence one way or the other that a function is essential," and "[a]bsent independent evidence that the function was non-essential, we do not believe it wise to consider the special assignment as proof that delivery was not an essential function because it would punish [the employer] for going beyond the [Americans with Disabilities Act's] requirements."  *Id.* at 930.  The same is true here.  If DoDEA was too generous in previously permitting Smithson to come in late, or if Smithson took advantage of the vagueness of her accommodation before DoDEA required her to spell out how much time she needed, it should not be proof that attendance was not essential, especially given the other evidence demonstrating that attendance was essential.  *See also Vande Zande v. Wis. Dep't of Admin.*, 44 F.3d 538, 545 (7th Cir. 1995) ("And if the employer . . . bends over backwards to accommodate a disabled worker—goes further than the law requires—by allowing the worker to work at home, it must not be punished for its generosity by being deemed to have conceded the reasonableness of so far-reaching an accommodation.").

16

In short, attending school during the first two hours and being available to collaborate or attend training were essential functions of Smithson's job, and she could not do them.[3] Therefore, she was not a "qualified individual with a disability," and DoDEA is entitled to summary judgment on this claim.

## C. Disparate Treatment

Smithson also brings a disparate-treatment claim, asserting that being forced to use her sick leave constituted an adverse employment action. *See Reed v. Columbia St. Mary's Hosp.*, 915 F.3d 473, 484 (7th Cir. 2019) ("A plaintiff suing under the Rehabilitation Act can assert that she was intentionally discriminated against or that the defendant failed to afford her a reasonable accommodation for her disability."). But to succeed on this claim, Smithson must show that she was capable of performing the essential functions of the job with or without a reasonable accommodation. *Whitaker v. Wis. Dep't of Health Servs.*, 849 F.3d 681, 684 (7th Cir. 2017). As previously discussed, she cannot do so, so her disparate-treatment claim fails. *Id.* ("Since [the plaintiff] failed to establish that she could perform the essential functions of her job, her Rehabilitation Act claim fails.").

## D. Improper Disclosure of Medical Information

Finally, Smithson contends DoDEA improperly stored her medical information. With some exceptions not at issue here, information about an employee's medical

---

[3] Smithson does not argue that DoDEA should have made these trainings and collaboration sessions available for her to access remotely. She does not respond to DoDEA's argument that she was not qualified other than to say she always had these accommodations and she had positive performance reviews. The Court focuses on the arguments she advances. *See Vaughn v. King*, 167 F.3d 347, 354 (7th Cir. 1999) ("It is not the responsibility of this court to make arguments for the parties.").

condition or history must be "maintained on separate forms and in separate medical files" and be "treated as a confidential medical record."  42 U.S.C. § 12112(d)(3)(B); 42 U.S.C. § 12112(d)(4)(C); 29 U.S.C. § 791(f) (incorporating applicable sections of Americans with Disabilities Act into Rehabilitation Act).

At some point, documentation of Smithson's accommodations was stored in her personnel file, which was kept in a locked cabinet behind a locked door.  (ECF No. 44-4 at 3; Smithson Dep. 261–67, ECF No. 35-1.)   This was improper, as the documentation should have been maintained in a "separate medical file[]."  However, to be entitled to relief on an improper-disclosure claim, courts have required a plaintiff to show that the medical information was disclosed by the employer and that the plaintiff suffered a tangible injury as a result.  *See, e.g.*, *Brown v. Wilkie*, No. 1:20-cv-01154-JPH-MJD, 2022 WL 1658802, at *10 (S.D. Ind. May 24, 2022); *McPherson v. O'Reilly Auto., Inc.*, 491 F.3d 726, 732 (8th Cir. 2007); *see O'Neal v. City of New Albany*, 293 F.3d 998, 1007 (7th Cir. 2002) (in context of employer requiring plaintiff to undergo medical examination, collecting cases in which courts have "required that a nondisabled plaintiff *at least* show some tangible injury-in-fact caused by the § 12112(d) violation").  Smithson cannot show either.  Her only argument on this front is that her information must have been disclosed because people "who had no other way of knowing" about her medical condition knew about it, "as evidenced by the constant efforts to disrupt Smithson's work environment and affect her anxiety and attention deficit."  (Pl.'s Resp. 20, ECF No. 45.)  But this is merely speculation, which will not defeat summary judgment.  *Herzog*, 742 F.3d at 806 (quoting *Tubergen*, 517

18

F.3d at 473) ("inferences that are supported by only speculation or conjecture will not

defeat a summary judgment motion").

**Conclusion**

DoDEA's Motion for Summary Judgment, (ECF No. 35), is **granted**.  Smithson's

claims are **dismissed with prejudice**.  Final judgment shall issue separately.

**SO ORDERED**.

Date: 08/04/2022

_____
JAMES R. SWEENEY II, JUDGE
United States District Court
Southern District of Indiana

Distribution to registered parties of record via CM/ECF.